******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ROBERT DEARING *v.* COMMISSIONER OF CORRECTION
## (AC 46279)

Alvord, Westbrook and Bear, Js.

*Syllabus*

The petitioner, who had been convicted of sexual assault in the first degree and risk of injury to a child, appealed, on the granting of certification, from the judgment of the habeas court denying his petition for a writ of habeas corpus. The petitioner claimed that the court improperly failed to conclude that he received ineffective assistance from his criminal trial counsel, appellate counsel, and prior habeas counsel. *Held*:

The habeas court properly concluded that the petitioner's criminal trial counsel did not provide ineffective assistance by failing to hire, consult with, or present the testimony of a child abuse expert, as the petitioner failed to establish that his counsel's performance fell outside the wide range of reasonable professional assistance, and, even assuming that it was professionally unreasonable for his counsel not to have engaged his own child abuse expert and that this failure amounted to deficient performance under the facts of this case, the petitioner failed to establish that he was prejudiced by his counsel's performance.

The habeas court properly concluded that the petitioner's criminal trial counsel did not provide ineffective assistance by failing to obtain the victim's confidential medical records or to object to or seek to have stricken certain testimony from the state's child forensic interview expert, the petitioner having failed to demonstrate that his counsel's performance was deficient. The habeas court properly determined that the petitioner's appellate counsel did not provide ineffective assistance by not raising as an appellate issue in the petitioner's direct appeal that the trial court improperly denied the petitioner's request for the disclosure of the victim's medical and psychological records on the ground that they contained nothing exculpatory, the petitioner having failed to satisfy his burden of demonstrating deficient performance.

Because this court concluded that the habeas court correctly determined that the petitioner had failed to establish that either his criminal trial counsel or his appellate counsel provided constitutionally ineffective assistance, his claim of ineffective assistance against his prior habeas counsel also necessarily failed.

Argued October 9, 2024—officially released January 14, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *M. Murphy, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Nicole P. Britt*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Jo Anne Sulik*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Nancy L. Chupak* and *Mark G. Ramia*, senior assistant state's attorneys, for the appellee (respondent).

*Opinion*

WESTBROOK, J. The petitioner, Robert Dearing, appeals, following the granting of his petition for certification to appeal, from the judgment of the habeas court denying his amended petition for a writ of habeas corpus in which he alleged the ineffective assistance of his criminal trial counsel, appellate counsel, and prior habeas counsel. The petitioner claims on appeal that the habeas court improperly failed to conclude that (1) his criminal trial counsel provided ineffective assistance by failing (a) to engage and present the testimony of a child abuse expert, (b) to obtain certain confidential records of the victim, and (c) to object to or have stricken certain testimony provided by the state's expert on child forensic interviews; (2) appellate counsel provided ineffective assistance in his direct criminal appeal by failing to challenge the trial court's decision not to release the victim's confidential records; and (3) prior habeas counsel provided ineffective assistance by failing to raise in his previous habeas action the foregoing claims of ineffective assistance directed at

trial and appellate counsel. We disagree and, accordingly, affirm the judgment of the habeas court.

This court previously set forth the following facts pertaining to the petitioner's criminal conviction as reasonably could have been found by the jury. See *State* v. *Dearing*, 133 Conn. App. 332, 334–38, 34 A.3d 1031, cert. denied, 304 Conn. 913, 40 A.3d 319 (2012). "The [petitioner] was born in 1978. The victim [K] was born in 2000; she suffers from [a] pervasive developmental disorder not otherwise specified.[1] [K's parents] . . . and the [petitioner] were longtime intimate friends, and [K's] father frequently went to the [petitioner's] home on weekends to work on automobiles with the [petitioner]. [K] referred to the [petitioner] as Uncle Rob, although there was no familial relationship between them. Often, [K] accompanied her father to the [petitioner's home], where she sat in the living room watching television while her father and the [petitioner] worked on automobiles in the garage . . . . The father frequently would go to an auto parts store or to a convenience store while the [petitioner] ostensibly remained in the garage working on the automobiles, and the father would leave [K] at the [petitioner's] home . . . sometimes [for] more than one-half hour. . . .

"[I]n November, 2008, [K] and her father again were at the [petitioner's] home, and the father left to go to

---

[1] A pervasive developmental disorder is one that is "characterized by distortions in the development of the basic psychological functions such as language, social skills, attention, perception, reality testing, and movement." (Internal quotation marks omitted.) *State* v. *Dearing*, supra, 133 Conn. App. 334 n.2. The term "pervasive developmental disorder not otherwise specified" is used "when there is a severe and pervasive impairment in the development of reciprocal social interaction associated with impairment in either verbal or nonverbal communication skills or with the presence of stereotyped behavior, interests, and activities, but the criteria are not met for a specific [disorder]." (Internal quotation marks omitted.) Id., quoting the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Text Rev. 2000), p. 84.

a convenience store to purchase drinks. When the father returned, the [petitioner] was in the living room sitting on the couch with [K]. The [petitioner] proceeded to tell the father that [K] had had 'an accident' and that he had taken care of it. [K] appeared to be somewhat upset. The father recalled that [K] had not soiled herself since she was three or four years old and that she only needed help on occasion with her belt or her buttons when using the bathroom.

"On Friday, November 14, 2008, [K's] mother was preparing [K] for a nap when the mother discovered [K] touching her genitals. After asking [K] some questions, the mother became concerned. On Monday, the mother contacted [K's] clinician, Natasha Jackson, who met with the mother on Tuesday and urged her to tell the father about her conversation with [K]. Later that night, the mother told the father that [K] had made allegations of sexual abuse against the [petitioner]. On Thursday, November 20, 2008, the father and the mother took [K] to the Waterbury police department to file a complaint. . . . [Shortly thereafter] Officer Cathleen Knapp . . . met [with the mother] at the family home . . . . An employee from the [D]epartment of [C]hildren and [F]amilies (department), Sheila Negron, accompanied Knapp to that meeting. Knapp learned that when the mother was putting [K] down for a nap, [K] revealed that the [petitioner] had told [her] that her private parts were dirty and needed to be cleaned and that the [petitioner] then 'cleaned' her private parts using his private parts. The mother told Knapp that [K] pointed to her vaginal and anal areas when explaining what the [petitioner] had done. After speaking with the mother, Knapp and Negron also spoke with [K], who reported to them that the [petitioner] had done a 'no-no' and that after telling her that she was dirty and that he had to clean her, the [petitioner] then 'cleaned' her private parts using his private parts.

"Approximately one week later, on December 1, 2008, [K] was taken to [meet with] Jessica Alejandro, a clinical child interview specialist, [who] conducted a forensic interview. The interview was observed by Knapp and Negron. During the interview . . . [K gave a detailed description of her assault by the petitioner].

"On December 3, 2008, the police interviewed the [petitioner], advised him of his rights, applied for and were issued an arrest warrant, and ultimately arrested the [petitioner] that same night. The [petitioner] was charged with sexual assault in the first degree [in violation of General Statutes § 53a-70 (a) (2)] and risk of injury to a child [in violation of General Statutes § 53-21 (a) (2)]. He was tried before a jury, found guilty on both counts and sentenced to a total effective term of thirty years [of] incarceration, execution suspended after twenty years, with fifteen years the mandatory minimum, and twenty years [of] probation." (Footnote added; footnotes omitted.) Id., 334–38. This court affirmed the judgment of conviction; id., 334; and our Supreme Court denied certification to appeal. See *State* v. *Dearing*, 304 Conn. 913, 40 A.3d 319 (2012).

While his direct appeal was pending, the petitioner filed a petition for a writ of habeas corpus as a self-represented party (first habeas action). He thereafter was appointed counsel, Attorney Hilary Carpenter, who filed an amended petition on his behalf. The petitioner alleged in his amended petition that his criminal trial counsel, Attorney Kevin Smith, had provided ineffective assistance of counsel regarding a pretrial plea offer by the state.[2] The habeas court denied the amended

[2] "Specifically, the petitioner allege[d] . . . that [Smith] never 'meaningfully' conveyed the plea offer to him; that [Smith] never fully informed the petitioner about the state of the evidence for and against him; that [Smith] misadvised him that a guilty plea would entail sex offender registration which could bar the petitioner from residing with his own children; that [Smith] failed to explain that the maximum sentence after trial could be thirty-five years imprisonment; and that [Smith] failed to discuss the possibility of an *Alford* plea and the beneficial aspects of the *Alford* doctrine."

petition. This court, by memorandum decision, dismissed the petitioner's appeal from the judgment of the habeas court, and the Supreme Court denied certification to appeal. See *Dearing* v. *Commissioner of Correction*, 156 Conn. App. 903, 112 A.3d 238, cert. denied, 317 Conn. 908, 114 A.3d 1223 (2015).

On June 4, 2014, the petitioner initiated this second habeas action, which underlies the present appeal. Appointed counsel filed the operative amended petition for a writ of habeas corpus on October 1, 2021. The petitioner again claimed that his constitutional right to the effective assistance of counsel was violated by Smith. He also claimed that he received ineffective assistance from his appellate counsel—then Attorney, now Judge, Auden Grogins—and from his previous habeas counsel, Carpenter. The petitioner alleged that Smith was ineffective because he failed (1) to conduct an adequate pretrial investigation and legal research; (2) to adequately prepare and present a defense; (3) to properly cross-examine and impeach the testimony of K; (4) to consult with or provide testimony from experts in the fields of child sexual abuse, child psychology, and forensic toxicology; (5) to obtain, utilize, and present at trial K's confidential medical and psychiatric records; and (6) to object to or move to strike the testimony of Diane Edell, the state's expert in the field of child forensic interviews, whose testimony the petitioner alleged improperly bolstered K's credibility. The petitioner alleged that Grogins was ineffective by failing adequately (1) to research the legal issues of the case, (2) to review the record, and (3) to raise a claim that the trial court improperly failed to turn over K's medical and psychiatric records to Smith following the court's in

*Dearing* v. *Warden*, Docket No. CV-11-4004258-S, 2014 WL 1344600, *1 (Conn. Super. March 6, 2014), appeal dismissed, 156 Conn. App. 903, 112 A.3d 238, cert. denied, 317 Conn. 908, 114 A.3d 1223 (2015); see also *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

camera review of those records. Finally, the petitioner alleged that Carpenter was ineffective by failing to raise in the first habeas action the ineffective assistance of counsel claims that he raised in the present action regarding Smith and Grogins. The respondent, the Commissioner of Correction, filed a return to the amended petition on May 3, 2022, essentially leaving the petitioner to his proof.

The habeas court, *M. Murphy, J.*, conducted a trial on May 3 and 4, 2022.[3] The petitioner testified and also presented testimony from Smith; Grogins; Carpenter; forensic psychologist Nancy Eiswirth; and Attorney Brian Carlow, the petitioner's criminal defense expert.[4] The respondent called no witnesses. The petitioner filed a posttrial brief. The respondent declined to file a posttrial brief, indicating in a notice filed with the court that it believed the petitioner had failed to proffer any evidence to support his claims. On January 3, 2023, the court issued a memorandum of decision denying the petition.

In its decision, the court concluded that the petitioner had failed to meet his burden of demonstrating that Smith's performance was deficient or, even if it was, that he was prejudiced by counsel's performance. Relevant to the claims raised by the petitioner in the present appeal, the habeas court found that the petitioner failed

---

[3] A trial initially had begun on September 11, 2018, before Judge John M. Newson. Sometime after the first day of trial, however, the petitioner's assigned counsel became unable to continue representing the petitioner, and, as a result, the court declared a mistrial and ordered new counsel appointed.

[4] Carlow testified regarding the standard of care for an attorney representing a criminal defendant. The habeas court made the following findings regarding Carlow's testimony: "Carlow opined as to several areas [Smith] could have further examined or addressed regarding [K's] testimony, preparation, and responses to the trial judge's rulings. This court did not find . . . Carlow's testimony sufficiently persuasive to establish that [Smith] had acted ineffectively as counsel."

to sustain his burden of establishing either deficient performance or prejudice with respect to Smith's decision not to present testimony from an expert on child sexual abuse or child psychology. The court found that Smith's decision not to call an expert witness at the petitioner's trial constituted a reasonable strategic choice, crediting Smith's testimony that (1) he had consulted with an expert prior to trial; (2) he had handled prior sexual assault cases and was familiar with forensic interviews, including how they are conducted and the case law addressing their admissibility; (3) the petitioner would not authorize him to hire or call an expert; and (4) in Smith's view, calling an expert was not necessary in this case. Moreover, although acknowledging the expert testimony provided by Eiswirth at the habeas trial regarding potential areas of inquiry that Smith might have raised to an expert regarding K's forensic interview, the court was not persuaded by Eiswirth's testimony that the petitioner had established a reasonable probability that the outcome of the criminal trial would have been different if Smith had called her or another expert to testify.

Next, the habeas court found that the petitioner had failed to sustain his burden of establishing either deficient performance or prejudice with respect to his claim regarding Smith's handling of K's medical records. Underlying the petitioner's claim is his assertion that the trial court applied an incorrect legal standard when it denied Smith's request to disclose K's confidential health records to the defense following an in camera review because it had found nothing of an exculpatory nature in the records. In rejecting the petitioner's claim, the court stated that, "[i]n light of the requirement that this court indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, the court finds that the petitioner failed to prove that [Smith's] attempts to obtain [K's]

confidential records constituted deficient performance. Moreover, the petitioner failed to demonstrate that a different approach by [Smith] would have been successful in obtaining the records or that there is a reasonable probability that the introduction of the records would have changed the outcome of the petitioner's trial.''

Finally, the court determined that the petitioner failed to sustain his burden of establishing either deficient performance or prejudice with respect to his claim that during Edell's testimony, Smith failed to adequately object to or move to strike Edell's response to a hypothetical question posed by the state to which Smith had objected. The court found that Smith's failure to raise any additional objection following Edell's response to the state's question did not fall outside the wide range of reasonable professional assistance nor did the petitioner establish prejudice by demonstrating that Smith would have been successful if he had sought to have Edell's response stricken or that striking Edell's response would have had a reasonable probability of changing the outcome of the petitioner's trial.

Turning to the claims against appellate counsel, the court concluded that the petitioner also had failed to prove that Grogins' performance on direct appeal was deficient. The court credited Grogins' testimony at the habeas trial regarding her general practices in preparing for an appeal, which included narrowing down the number of issues that ultimately would be raised based on their relative strength. The court also credited Grogins' testimony that she had elected not to raise a claim regarding K's medical records because the trial court properly had conducted an in camera review as requested by the petitioner and she had no clear basis for challenging the trial court's determination that there was no disclosable information because there was nothing in the record that demonstrated otherwise. The habeas court also determined that the petitioner had

not demonstrated that he was prejudiced by Grogins' failure to raise the issue on appeal.

Lastly, the court determined that the petitioner's claim that Carpenter provided ineffective assistance of counsel in his prior habeas action by not raising the foregoing claims regarding Smith's and Grogins' performance necessarily also failed. The court explained that, in order to establish his claim against Carpenter, the petitioner first needed to establish that Smith or Grogins was ineffective, and, because the court already had determined that the petitioner failed to prove that either of them provided ineffective assistance of counsel, the claim against Carpenter necessarily also failed. The habeas court rendered judgment on the petition in favor of the respondent. This appeal followed. Additional facts will be set forth as necessary.

Before turning to the petitioner's claims on appeal, we first set forth well settled principles of law that govern our review. "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may [deny] a petitioner's claim if he fails to meet either prong. . . .

"With respect to the performance prong, the court in *Strickland* further elaborated as follows: Judicial

scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess [trial] counsel's assistance after conviction . . . and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . Our Supreme Court has stated that to establish deficient performance by counsel, a [petitioner] must show that, considering all of the circumstances, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. . . .

"Our Supreme Court, in *Lozada* v. *Warden,* [223 Conn. 834, 843, 613 A.2d 818 (1992)], established that habeas corpus is an appropriate remedy for the ineffective assistance of appointed habeas counsel, authorizing . . . a second petition for a writ of habeas corpus . . . challenging the performance of counsel in litigating an initial petition for a writ of habeas corpus . . . [that] had claimed ineffective assistance of counsel at the petitioner's underlying criminal trial or on direct appeal. . . . Nevertheless, the court in *Lozada* also emphasized that a petitioner asserting a habeas on a habeas faces the herculean task . . . of proving in accordance with [*Strickland*] both (1) that his

appointed habeas counsel was ineffective, and (2) that his trial [or appellate] counsel was ineffective. . . .

"Simply put, a petitioner cannot succeed . . . on a claim that his habeas counsel was ineffective by failing to raise a claim against trial counsel or prior habeas counsel in a prior habeas action unless the petitioner ultimately will be able to demonstrate that the claim against trial or prior habeas counsel would have had a reasonable probability of success if raised. . . .

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed [on appeal] unless they are clearly erroneous. . . . Thus, the [habeas] court's factual findings are entitled to great weight. . . . [A] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Crocker* v. *Commissioner of Correction*, 220 Conn. App. 567, 583–86, 300 A.3d 607, cert. denied, 348 Conn. 911, 303 A.3d 10 (2023).

I

The petitioner first claims that the habeas court improperly failed to conclude that his criminal trial counsel, Smith, provided ineffective assistance. In particular, the petitioner argues that Smith was ineffective because he failed (1) to hire, consult with, or present the testimony of a child abuse expert; (2) to obtain K's confidential medical records; and (3) to object to or seek to have stricken certain testimony from Edell, the

state's child forensic interview expert. We disagree and address each of the petitioner's arguments in turn.

A

The petitioner first argues that Smith provided ineffective assistance by failing to hire, consult with, and present testimony at trial from an expert on child sexual abuse. According to the petitioner, an expert would have aided his defense by undermining K's credibility in the minds of the jurors. For instance, an expert would have informed a jury that a child suffering from pervasive developmental disorder (PDD) may be more susceptible to the influence of other people. See footnote 1 of this opinion. The petitioner further contends that, contrary to the finding of the habeas court, Smith never consulted with a child abuse expert as to the unique facts and circumstances of the present case. According to the petitioner, Smith's failure to consult with an expert left him unaware of how an expert might have viewed the petitioner's case, and, therefore, his decision not to engage an expert to testify at trial cannot reasonably be construed as a product of sound trial strategy. Rather, the petitioner contends that Smith's decision not to engage an expert was made solely because he was representing the petitioner pro bono and the petitioner was unable to pay for an expert. We are not persuaded.

"[T]here is no per se rule that requires a trial attorney to seek out an expert witness. . . . [T]his court [has] noted [however] that in some cases, the failure to use any expert can result in a determination that a criminal defendant was denied the effective assistance of counsel." (Citation omitted; internal quotation marks omitted.) *Stephen S.* v. *Commissioner of Correction*, 134 Conn. App. 801, 811, 40 A.3d 796, cert. denied, 304 Conn. 932, 43 A.3d 660 (2012). "In *Stephen S.*, after analyzing relevant case law, [this court] concluded that cases

involving child sexual abuse may, depending on the circumstances, require some pretrial investigation and consultation with expert witnesses. . . . This can be true of both medical experts and psychological experts. . . . [If] trial counsel has consulted with such experts, however, but made the tactical decision not to produce them at trial, such decisions properly may be considered strategic choices." (Citations omitted; internal quotation marks omitted.) *Antonio A.* v. *Commissioner of Correction,* 148 Conn. App. 825, 833–34, 87 A.3d 600, cert. denied, 312 Conn. 901, 91 A.3d 907 (2014). It is the petitioner's burden to demonstrate that an expert was necessary to establish an asserted defense. See *Kellman* v. *Commissioner of Correction,* 178 Conn. App. 63, 78, 174 A.3d 206 (2017).

The following additional facts are relevant to our consideration of the petitioner's argument. Smith was not appointed as counsel but, rather, had been hired privately by the petitioner. Smith explained at the habeas trial that all fees and costs associated with consulting and hiring an expert are the responsibility of the client and are not covered by the flat fee charged for pretrial representation. Smith also testified that the theory of the defense was that the sexual abuse allegations against the petitioner had been concocted out of spite by K's mother after the petitioner ended a romantic relationship with her[5] and that she or K's father had taken advantage of the cognitive difficulties associated

---

[5] As this court noted on direct appeal, K's mother testified at the criminal trial that she had maintained a sexual relationship with the petitioner for ten of the approximately twelve years that she had known him. See *State* v. *Dearing,* supra, 133 Conn. App. 335 n.3. "She also testified that the father was aware of the relationship, that he also was involved in it and that the three of them had sexual relations in the garage at the [petitioner's] home, sometimes while [K] was in the adjoining living room. The mother admitted that she did not tell the police or anyone involved in the investigation about this relationship, which she said ended when [K] made allegations against the [petitioner]." Id.

with K's PDD to manipulate K into accusing the petitioner of abuse. Smith acknowledged that a significant part of the defense strategy was to undermine K's credibility as a witness. Smith testified that he did not recall whether he had consulted with an expert regarding K's cognitive issues or K's forensic interview, although he did recall consulting with such an expert, Dr. James J. Connolly, in a different matter around that time with whom he may have discussed the petitioner's case. Smith further recalled discussing with the petitioner the possibility of consulting and calling to testify at trial an expert in child sexual assault. Smith remembered discussing the cost of such an expert with the petitioner, which he testified would have been between $5000 and $10,000. In response to a question about whether the decision to engage an expert was driven solely by the petitioner's inability to pay, Smith responded: "No. . . . I wouldn't say it was inability. I . . . think it was just an unwillingness." Smith recalled that the petitioner did not think an expert was necessary and did not "want to spend the financial resources on it."

At the habeas trial, to establish the importance of an expert in this case, the petitioner presented testimony from Eiswirth, who had reviewed all of the criminal trial transcripts as well as some of K's medical, department, and school records. Eiswirth testified that children with PDD tend to have a higher level of suggestibility than other children and that, because K's initial disclosure of sexual abuse by the petitioner came in response to her mother asking her if someone had touched her, it was possible that K's mother planted the idea in K's mind. Eiswirth also noted that PDD can affect a child's ability to recall an event. She opined that, if counsel had hired her as an expert, she would have pointed out portions of K's forensic interview that she viewed as problematic. On cross-examination, however, the respondent was able to undermine some of

that testimony.[6] Moreover, Eiswirth admitted on cross-examination that she had not personally evaluated K and, as a result, could not offer an opinion as to whether K's PDD increased her level of suggestibility. Eiswirth also acknowledged, on the basis of her review of K's trial testimony and K's forensic interview, that K's ability to recall and provide such highly detailed descriptions of the petitioner's assault would have undercut any expert opinion or argument that her PDD affected her ability to recall events.

We acknowledge that, in a matter like the present one in which there was no physical evidence of sexual abuse and the case turned on the credibility of a child victim with an established developmental disorder, counsel reasonably could be expected to engage in a thorough pretrial investigation that included more than a cursory consultation with expert witnesses. See *Stephen S.* v. *Commissioner of Correction*, supra, 134 Conn. App. 811. As we have often repeated, however, "[i]n a habeas trial, the court is the trier of fact and, thus, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony . . . . It is simply not the role of this court on appeal to second-guess credibility determinations made by the habeas court." (Internal quotation marks omitted.) *Hilton* v. *Commissioner of Correction*, 225 Conn. App. 309, 340, 315 A.3d 1135 (2024). Here, the habeas court credited

---

[6] Eiswirth believed that the forensic interviewer had not effectively followed up about inconsistencies in K's statement or about K's claim that the petitioner had anally penetrated her, which Eiswirth characterized as "implausible" because such an assault was, in her opinion, unlikely to have occurred without applying some form of lubricant, which K never mentioned and the interviewer never asked K about. Under cross-examination, however, Eiswirth acknowledged that it would have been consistent with K's testimony if the petitioner tried to engage in anal intercourse but stopped when K complained that it hurt. Thus, calling attention to K's failure to mention lotion or other lubricant would not necessarily have rendered her account any less plausible to a jury.

Smith's explanation that he had discussed with the petitioner the possibility of consulting with a child abuse expert and potentially calling an expert to testify at trial but that the petitioner would not authorize him to hire or call an expert because, in the petitioner's view, an expert was not necessary in this case. The habeas court was free to conclude on the basis of the evidence presented that the petitioner would have been able to pay for an expert if he believed one was necessary after consulting with Smith, and the petitioner's own legal expert testified that the petitioner would have needed to be indigent for Smith to have successfully sought public funding for an expert. The habeas court also credited Smith's testimony that he was familiar with child forensic interviews and the legal issues related to them from his handling of other sexual assault cases and that he had discussed some aspects of the present case prior to trial with an expert that he was consulting in another matter. The petitioner has failed to demonstrate that any of the court's factual findings are clearly erroneous or that the testimony credited by the habeas court does not form a sufficient factual basis for concluding that Smith's performance, under the circumstances, did not fall outside the wide range of reasonable professional assistance.

Nevertheless, even if we were to assume without deciding that it was professionally unreasonable for counsel not to have engaged his own child abuse expert in this matter, and that this failure amounted to deficient performance under the facts of this case, we nevertheless agree with the habeas court and the respondent that the petitioner failed to establish, either through Eiswirth's testimony or otherwise, that he was prejudiced by counsel's performance. See *Raynor* v. *Commissioner of Correction*, 222 Conn. App. 584, 616, 306 A.3d 25 (2023) ("[a] court need not determine the deficiency of counsel's performance if consideration of the

prejudice prong will be dispositive of the ineffec-
tiveness claim" (internal quotation marks omitted)),
cert. denied, 348 Conn. 944, 307 A.3d 910 (2024).

In *Strickland,* the United States Supreme Court
offered the following guidance to courts regarding the
prejudice prong: "Even if a [petitioner] shows that par-
ticular errors of counsel were unreasonable . . . the
[petitioner] must show that they actually had an adverse
effect on the defense. It is not enough for the [petitioner]
to show that the errors had some conceivable effect
on the outcome of the proceeding. Virtually every act
or omission of counsel would meet that test . . . and
not every error that conceivably could have influenced
the outcome undermines the reliability of the result of
the proceeding. . . . [A]ny error, if it is indeed an error,
impairs the presentation of the defense . . . . On the
other hand . . . a [petitioner] need not show that coun-
sel's deficient conduct more likely than not altered the
outcome in the case. This outcome-determinative stan-
dard . . . is not quite appropriate. . . . [Rather,
under] the appropriate test for prejudice . . . [t]he
[petitioner] must show that there is a reasonable proba-
bility that, but for counsel's unprofessional errors, the
result of the proceeding would have been different. *A
reasonable probability is a probability sufficient to
undermine confidence in the outcome.*" (Citations
omitted; emphasis added; internal quotation marks
omitted.) *Strickland* v. *Washington,* supra, 466 U.S.
693–94.

Our review of the record leads us to conclude that
any error by Smith in failing to engage his own child
abuse expert did not establish a reasonable probability
that the results would have been different, thus depriv-
ing the petitioner of a fair trial. Smith was able to use
his prior experience in other child sexual abuse cases,
the knowledge he gained from his consultation with
Connolly, and his own research, including regarding

PDD, to effectively cross-examine K and Edell, the state's expert witness, including eliciting testimony from Edell regarding the potential unreliability of K's forensic interview and her allegations of sexual abuse by the petitioner. See *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 102, 52 A.3d 655 (2012) (defense counsel's failure to call defense expert did not prejudice petitioner because counsel was able to sufficiently establish points essential to defense through cross-examination of state's experts and by arguing points in closing argument to jury). K also testified before the jury and, therefore, the jury was able to directly evaluate how she understood and answered questions. Smith was able to demonstrate during his cross-examination of K that she had difficulties in communicating and sometimes gave contradictory answers. Moreover, Smith established through Edell that forensic interviewers generally are not trained regarding the effects of PDD; that children should be asked open-ended, rather than yes or no, questions during interviews to avoid planting false facts in the child's mind; that interviewers should follow up on inconsistencies within a child's statement; and that strict guidelines must be followed when using dolls and drawings. All of this allowed Smith to effectively challenge the credibility of K's testimony to the jury in his closing argument.[7]

---

[7] For example, during closing argument, Smith argued in relevant part as follows: "[D]id anybody else in this case that you heard of ever make a single attempt to find out whether what this child was saying was true, whether or not there was any reliability to it? We heard from the state's own experts that there are issues of suggestibility. That these folks need to be trained when they're doing these interviews, these forensic interviews. . . . [W]e don't want to interview these children too many times [because] there is a danger of contamination. Well, yeah, there is. Was that danger present here? Yeah, it sure was. Did anybody who was conducting these interviews bother to find out whether or not there was that danger of contamination? No. Who . . . talked to this child? Well, according to the mom, she talked to her. According to the mom, the child was giving her all sorts of details. According to the dad, he talked to the child as well before she went to the . . . forensic interview. [When] [h]e talked to her, he asked

In short, we are unconvinced on this record that any claimed failures by Smith regarding the use of a child abuse expert had any appreciable effect on the trial or undermine our confidence in the outcome of the criminal trial. The petitioner did not meet his burden of demonstrating that testimony from a defense expert was necessary to establish a defense. See *Kellman* v. *Commissioner of Correction*, supra, 178 Conn. App. 78. Accordingly, even if we viewed Smith's failure to utilize his own child abuse expert in this matter as deficient performance, the petitioner has failed to establish the prejudice prong of *Strickland.*

B

The petitioner next argues that Smith provided ineffective assistance of counsel because he failed to obtain the release of K's medical records and have them admitted as evidence, in accordance with *State* v. *Bruno*, 197 Conn. 326, 497 A. 2d 758 (1985), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986), and its progeny. We agree with the habeas court that the petitioner has failed to demonstrate that Smith's performance was deficient.

"In *State* v. *Bruno*, [supra, 197 Conn. 326], and *State* v. *Esposito*, 192 Conn. 166, 471 A.2d 949 (1984), [our Supreme Court] considered the question of when a trial court or a criminal defendant should be permitted to

---

her one question and the child began to narrate and could recollect and recall [with] no problem. All he asked her was that one question. Really? Does that jive with what you saw here? . . .

"You watched the video [of the forensic interview]. Did you ever see [the forensic interviewer] say, K, do you know what it means to tell the truth? No, you don't see any of that. What do you see? What was she consistent about? . . . And what happened when she was tested? She told us the big no-no never happened. She couldn't identify [the petitioner], though he's right there and he's the only uncle that she's had. . . . What happened when I asked her, who's talked to you about this? She shuts down. She is, frankly, we'll never know what is going on there. We'll never [know] what's going on in her head."

examine psychiatric records of a state's witness to determine whether there was relevant impeaching evidence in light of the statutory psychiatric-patient privilege of General Statutes § 52-146e. In both cases the trial court refused to conduct an in camera inspection of the records because it determined that the statutory privilege protecting the confidentiality of the records precluded it from doing so. In [*Esposito*], [the court] enunciated a procedure, approved in [*Bruno*], [that] would protect the witness' statutory right to confidentiality while simultaneously safeguarding the defendant's constitutional right effectively to cross-examine the witness. . . . That procedure is as follows: If . . . the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal." (Citation omitted; internal quotation marks omitted.) *In re Robert H.*, 199 Conn. 693, 708–709, 509 A.2d 475 (1986).

"[T]he linchpin of the determination of [a] defendant's access to the records is *whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . .* so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation. . . . [If] . . . the witness' records are sought for the purpose of obtaining evidence of a mental condition bearing on the witness' testimonial capacity, we require the defendant, who is afforded an opportunity to voir dire persons with knowledge of the contents of the records sought, to adduce a factual basis from which the trial court may conclude that there is a reasonable ground to believe that the records will reveal that at any pertinent time [the witness' mental problem] affected his testimonial capacity to a sufficient degree to warrant further inquiry." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Hickey*, 135 Conn. App. 532, 557–58, 43 A.3d 701, cert. denied, 306 Conn. 901, 52 A.3d 728 (2012).

The following additional facts are relevant to our consideration of the petitioner's argument that Smith provided ineffective assistance by failing to obtain the release of K's medical records and have them admitted as evidence. Prior to trial, Smith filed a motion asking the court to conduct an in camera review of K's medical and counseling records to determine if they contained disclosable information in accordance with *State* v. *Esposito*, supra, 192 Conn. 166. The court, *Crawford, J.*, conducted a hearing at which Smith was able to establish, over objection from the state, reasonable grounds for the court to conduct an in camera review of K's medical records. The court granted Smith's motion and conducted an in camera review of the records. Following that review, the court declined to

release any documents to the petitioner. In an oral deci-
sion, the court indicated that it "did not find anything
of an exculpatory nature. . . . [T]here isn't any men-
tion of the [petitioner] personally."

   As reflected in the operative petition for habeas cor-
pus, the issue before the habeas court and, thus, this
court on appeal, was whether Smith provided ineffec-
tive assistance with respect to his efforts to obtain the
release of the medical records. The habeas court con-
cluded that the petitioner had failed to establish both
that Smith's performance in that regard was deficient
and that the petitioner was prejudiced by Smith's
alleged deficiency. On appeal, rather than identify in his
principal appellate brief any clear deficiency in Smith's
attempt to secure access to K's confidential records,
the petitioner, after acknowledging that "Smith success-
fully obtained an in camera review of K's medical and
psychological records," focuses his discussion on what
he perceives to be the trial court's application of an
incorrect legal standard in conducting that review and
declining to release the records to Smith.[8] The petitioner
also asserts that the habeas court could not have deter-
mined that the petitioner was not prejudiced by coun-
sel's failure to obtain the record because the habeas

_____

[8] The petitioner contends that it is clear from the criminal trial court's
statement declining to release any of the medical records to the petitioner
that the court erroneously had limited its review of the record to "exculpa-
tory" information, whereas the court's review also should have included
any information probative of K's ability to comprehend, know, and correctly
relate the truth.

   Our review of the hearing on the motion seeking in camera review of the
records, however, demonstrates that the court clearly understood the proper
scope of its review. For example, at one point the court asked Smith to
explain "[h]ow would a review of the records concerning her treatment for
a seizure disorder lead to a conclusion about whether or not credibility or
reliability is a factor? That's what I'm not following." The record further
reveals, as argued by the respondent on appeal, that both the court and the
parties used the term "exculpatory" as a term of convenience to refer to
any disclosable material under the appropriate standard.

court did not conduct its own, independent review of the confidential records, which the petitioner argues it was required to do. None of these arguments, however, addresses the habeas court's determination that the petitioner failed to meet his burden of demonstrating that Smith's performance vis-à-vis the medical records was deficient. To prevail on appeal, the petitioner must demonstrate reversible error on the part of the habeas court with respect to both the performance and prejudice prongs as applied to counsel's performance. Because the petitioner has failed to explain adequately how the trial court's purported legal error in conducting the in camera review establishes that Smith's efforts to obtain access to the confidential files fell below an objective standard of reasonableness as measured by prevailing professional norms,[9] and mindful of our highly deferential scrutiny of counsel's performance, we reject the petitioner's argument.

C

The petitioner finally argues that Smith provided ineffective assistance of counsel by failing to object to or seek to have stricken certain criminal trial testimony by Edell. Again, we disagree.

The following additional facts are relevant to our consideration of the petitioner's argument. During her redirect examination of Edell at the criminal trial, the prosecutor asked Edell to assume the following facts:

[9] In his reply brief, the petitioner states for the first time that Smith's performance was deficient because he had a "duty to object [to] or otherwise remediate the [court's use of an incorrect standard of review] but failed to do so." Nevertheless, "[i]t is . . . a well established principle that arguments cannot be raised for the first time in a reply brief. . . . [I]t is improper to raise a new argument in a reply brief, because doing so deprives the opposing party of the opportunity to respond in writing." (Internal quotation marks omitted.) *Lewis* v. *Commissioner of Correction*, 211 Conn. App. 77, 101, 271 A.3d 1058, cert. denied, 343 Conn. 924, 275 A.3d 1213, cert. denied sub nom. *Lewis* v. *Quiros*,      U.S.      , 143 S. Ct. 335, 214 L. Ed. 2d 150 (2022).

"that a child is present in a forensic interview, that she is eight years of age and [has] developmental delays, and through the course of the interview the child [discloses] that a family friend had sexually abused her, and the abuse was penile/vaginal and penile/anal intercourse. And that that child, during the interview when asked by the interviewer how it felt, indicates that the vaginal intercourse felt okay [but] [w]hen asked about anal intercourse the child indicates, oh, no, it hurt. And, actually, the child then goes and holds her bottom as she's saying that. And further on in the interview when asked if anything came out of the family friend's . . . penis, the child indicated pee-pee and that the family friend had to wipe it out with a sponge." The prosecutor then asked Edell whether those facts had "any significance" "based on [her] training and experience . . . ." Smith objected to the question on the ground that it "sounds like it's going to elicit an opinion as to the ultimate issues in this case." The prosecutor responded that it was a proper hypothetical given Edell's testimony on cross-examination regarding the reliability of forensic interviews and whether certain sensory details and other factors could be applied to determine whether a child was telling the truth. The court overruled the objection "to the extent that the question pending was whether or not it had any significance . . . ." Edell then answered: "The things that stand out for me from that are that . . . if the child was eight years old, the child should not be expected to know about either intercourse or anal penetration, so there is inappropriate sexual knowledge. The fact that she made a distinction between the front and the back . . . also goes to reliability and that it just gives a little more credibility to the fact that . . . she experienced them rather than somebody told her to say that that happened. . . . [A]gain, the level of detail in terms of something coming

out of the penis, again, is inappropriate sexual knowledge for a child, not something necessarily that somebody would know we were going to ask about. Having the detail of what the person did with whatever came out is, again, just detail of the sexual act that we do look for.''

Smith did not object to Edell's answer or ask to have any portion stricken. On recross-examination, however, Smith posed his own hypothetical questions to Edell using factual scenarios that elicited responses that aided his defense strategy by undercutting K's credibility. Stated differently, the record demonstrates that Smith made a strategic choice not to renew his objection to the state's hypothetical or seek to have Edell's response stricken but, instead, elected to use Edell's responses to his own hypotheticals to further the defense.

We agree with the habeas court that it is unlikely that a renewed objection or motion to strike would have been successful given the court's earlier ruling allowing the question, and Smith's strategy regarding Edell's testimony was reasonable under the circumstances and, thus, did not constitute deficient performance. Because we conclude that the petitioner failed to establish deficient performance, we need not consider *Strickland*'s prejudice prong.

In sum, on the basis of our review of the trial and habeas records, the habeas court's decision, and the briefs of the parties, we conclude that the court properly concluded that the petitioner failed to meet his burden of demonstrating that Smith provided ineffective assistance of counsel. Accordingly, we reject the petitioner's claim to the contrary.

## II

The petitioner next claims that the court improperly determined that Grogins did not provide ineffective

assistance of counsel by not raising as an appellate issue in the petitioner's direct appeal that the trial court misapplied or misapprehended the holdings of *State* v. *Bruno*, supra, 197 Conn. 326, and its progeny, when it denied the petitioner's request for the disclosure of K's medical and psychological records on the ground that they contained nothing exculpatory. We agree with the habeas court that the petitioner has failed to satisfy his burden of demonstrating deficient performance.

The following additional facts are relevant to our resolution of the claim. Grogins had been an appellate lawyer for more than ten years at the time she was assigned to represent the petitioner in his direct criminal appeal. Her practice when assigned a case was to review the entire file provided by the public defender's office. In considering potential issues to raise on appeal, she would meet with the client, consider both preserved and unpreserved claims, and rank them in terms of their possibility for success. She ordinarily would raise only the strongest of those claims so as not to risk diluting the appeal with weaker claims. See *Saucier* v. *Commissioner of Correction*, 139 Conn. App. 644, 652–53, 57 A.3d 399 (2012) ("[appellate counsel's] strategy of culling out weaker claims is sound, not deficient, practice"), cert. denied, 308 Conn. 907, 61 A.3d 530 (2013).

At the habeas trial, Grogins recalled that one of the potential issues for appeal in the petitioner's case involved the court's in camera review of K's confidential medical and psychological records. She testified that she elected not to raise the issue because the criminal court properly had conducted an in camera review at the petitioner's request but found no information to disclose, and she had no specific information with which to challenge that finding. The court credited Grogins' testimony regarding her reasonable efforts in researching and reviewing the petitioner's file and found that she had made a reasonable strategic choice

not to raise that particular issue on appeal. The petitioner has failed to demonstrate otherwise.

Grogins chose, as a matter of sound strategy, only to raise on appeal those claims that she had reason to believe would be successful. Specifically, Grogins pursued the petitioner's claims that K was not competent to testify; that the hypothetical question posed to Edell by the state went to K's credibility, the ultimate issue in the case; and that the prosecutor had committed improprieties during trial and closing argument. See *State* v. *Dearing*, supra, 133 Conn. App. 334. Although these claims proved unsuccessful, this court will not, in hindsight, second-guess appellate counsel's strategic choices. As both our Supreme Court and this court repeatedly have explained, an appellate counsel's reasoned choice to pursue those claims with a likelihood of success, intentionally leaving out other, weaker claims, "is an appropriate and sound strategy." *Couture* v. *Commissioner of Correction*, 160 Conn. App. 757, 768, 126 A.3d 585, cert. denied, 320 Conn. 911, 128 A.3d 954 (2015), citing *State* v. *Pelletier*, 209 Conn. 564, 567, 552 A.2d 805 (1989) ("[t]he effect of adding weak arguments will be to dilute the force of the stronger ones" (internal quotation marks omitted)); see also *Saucier* v. *Commissioner of Correction*, supra, 139 Conn. App. 652–53. Because the petitioner has failed to demonstrate that Grogins made anything other than a reasonable strategic choice not to challenge the criminal court's decision not to turn over K's confidential records to trial counsel following an in camera review, the petitioner has failed to establish deficient performance. Accordingly, his claim of ineffective assistance of appellate counsel fails.

### III

Finally, the petitioner claims that the court improperly failed to conclude that his prior habeas counsel,

Carpenter, provided ineffective assistance by failing to raise in his first habeas action those claims raised in the present action directed at trial and appellate counsel. As previously set forth, to prevail on an ineffective assistance of counsel claim against prior habeas counsel for failing to raise one or more claims of ineffective assistance directed at trial or appellate counsel, the petitioner necessarily needed to accomplish the " 'herculean task' " of essentially satisfying the *Strickland* standard twice by establishing that both prior habeas counsel *and* trial or appellate counsel were ineffective. *Sanchez* v. *Commissioner of Correction*, 203 Conn. App. 752, 774, 250 A.3d 731, cert. denied, 336 Conn. 946, 251 A. 3d 77 (2021). Because we have concluded in parts I and II of this opinion that the habeas court correctly concluded that the petitioner failed to establish that either Smith or Grogins provided constitutionally ineffective assistance, his claim against Carpenter also fails.

The judgment is affirmed.

In this opinion the other judges concurred.